UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

MASTER FILE NO. 10-MD-2137
MDL NO. 2137

IN RE: SIGG SWITZERLAND (USA), INC. ALUMINUM BOTTLES

MARKETING AND SALES PRACTICES LITIGATION

**MEMORANDUM OPINION AND ORDER**

In this multi-district litigation case, Plaintiffs, consumers who purchased aluminum water bottles manufactured by Defendant, SIGG Switzerland (USA), originally filed nationwide class action claims in three states: Kentucky, Minnesota, and California. In their Second Amended Complaint, an Illinois plaintiff has joined the action. Essentially, Plaintiffs allege that Defendant, on its own and/or through third-parties, marketed its bottles as being free of Bisphenol A ("BPA"), which Plaintiffs allege may be harmful if consumed, when, in fact, the bottles contained and leached BPA. According to Plaintiffs, they only bought Defendant's bottles because of their mistaken belief that they were "BPA free" and they paid a significantly higher premium for the bottles because of that belief. Now, Plaintiffs seek recovery for the excess monies they expended on the bottles.

After this case was consolidated and transferred to this Court, on May 3, 2010, Plaintiffs filed their Amended Complaint. Soon after, Defendants moved to dismiss. In the midst of the briefing, on November 1, 2010, Plaintiffs filed their Second Amended Consolidated Complaint, which did not include the previous claims for breach of contract and express warranty. The latest complaint now alleges the following counts: (I) breach of implied warranty; (II) violation of California Consumer Legal Remedies Act (applicable to California residents only); (III)

violation of state consumer protection statutes; (IV) concealment/non-disclosure; and (V) unjust enrichment. Among the relief requested, Plaintiffs request "an order certifying the class and any appropriate subclasses." Defendant has moved to dismiss all of the claims and, in the alternative, to strike the nationwide class claims.

As an initial matter, both sides have debated various choice of law questions. The Court has taken some time to consider those issues and set out the principles that will govern in this case. The Court will address the remaining substantive issues in due course.

# I.

The following facts are taken exclusively from Plaintiffs' 43-page second amended consolidated complaint.

Defendant produces reusable aluminum drinking bottles and maintains its principal place of business in Stamford, Connecticut. Named Plaintiffs, citizens of Kentucky, Texas, California, Illinois and Minnesota, are consumers of reusable drinking bottles. Beginning in 2007, media reports and government agencies expressed concern about BPA, a chemical found in many plastic, reusable drinking bottles, indicating that it may present a danger for human consumption. Plaintiffs allege that Defendant responded to these concerns by marketing its bottles as "BPA-free" and that such marketing resulted in increased popularity of the bottles. In August of 2009, Defendant informed consumers that its old bottles contained BPA.

A key aspect of the complaint is Plaintiffs' allegations of specific statements by Defendant that its bottles were BPA-free. To that effect, Plaintiffs allege the following:

    (1)    Regarding the secret to SIGG's sales increases, the Forbes article stated: ". . . SIGG capitalized on the controversy [over BPA] by punching up marketing material with phrases like 'BPA-free.'" (Second Am. Compl. ¶ 21.)

(2) On numerous occasions, SIGG represented to consumers that its aluminum bottles contained no presence of BPA. SIGG refused to provide consumers with the composition of the epoxy liner that lined that interior of SIGG reusable aluminum bottles, hiding behind the "proprietary" and "confidential" nature of the formula of the epoxy liner. (Second Am. Compl. ¶ 22.)

(3) [W]hen consumer groups stated that SIGG's bottles might contain BPA, SIGG struck back. In early 2007, the Environmental Working Group ("EWG") published a guide to BPA-free products and stated its belief that SIGG bottles contained BPA. In response, SIGG President Wasik demanded that EWG either furnish proof of its "allegations" or remove SIGG from its report. On March 12, 2007, President Wasik issued a press release which contained the following: ". . . I can assure you that SIGG bottles are absolutely not made with a plastic liner and are in fact lined with a proprietary, non-toxic, water-based resin which has been refined over decades of study and is extremely safe & stable. . . . Sigg bottles have been thoroughly tested in Europe to ensure 0.0% leaching of any substance - no trace of BPA, BPB or any phthalates." (Second Am. Compl. ¶ 23.)

(4) . . . Sigg retained a marketing firm to post this information on other web sites. (Second Am. Compl. ¶ 24.)

(5) Also in March 2007, another consumer group, the Organic Consumers Association ("OCA"), reported in its newsletter that consumers should avoid SIGG bottles along with other products containing BPA. SIGG immediately contacted the OCA, and claimed that it had changed its liner to be BPA-free. The OCA then issued a retraction and letter of apology, stating in its next newsletter that SIGG "has since gone BPA-free, so it is now safe to purchase SIGG water bottles." . . . [SIGG President] Wasik proclaimed in a subsequent press release: "When we questioned the OCA on their mention of SIGG, this is the emailed response we received: 'We made a mistake. Sigg bottles do not contain BPAs.'" . . . [The release further] assured consumers that "SIGG bottles are leach-free and 100% safe." (Second Am. Compl. ¶ 25.)

(6) . . . SIGG similarly misled retailers selling SIGG bottles, including sophisticated retailers such as REI, Whole Foods, and Patagonia. For example, Patagonia claims that it "very clearly asked SIGG if there was BPA in [its] bottles and their liners, and they clearly said there was not." It is therefore not surprising that a retailer industry website confirmed that retailers were representing to consumers that SIGG bottles were BPA-free. . . . Mr. Wasik himself later stated in an interview that he was aware that some retailers were marketing SIGG bottles as BPA-free. (Second Am. Compl. ¶ 29.)

>   (7)  On April 16, 2008, [SIGG made a press release stating]: "Very thorough migration testing . . . has consistently shown SIGG bottles have ***no*** presence of lead, phthalates, Perfluorooctanoic Acid (PFOA), Bysphenol A (BPA), Bysphenol B (BPB) or any other chemicals which scientists have deemed as potentially harmful. (Second Am. Compl. ¶ 30.) (Emphasis in original).

Plaintiffs generally allege their reliance on Defendant's promotion of its products as BPA-free.

> Each plaintiff . . . came to understand that SIGG bottles were BPA-free. . . Even where the information was published by third parties, the "BPA-free" claim was typically attributed to SIGG or SIGG's representatives. Plaintiffs all decided to purchase SIGG bottles based on this information and the accompanying understanding that the bottles were BPA-free, and none would have purchased SIGG bottles had they known the bottles actually contained BPA.

(Second Am. Compl. ¶¶ 39-40.) Each plaintiff also details how he or she learned that BPA was potentially harmful and that SIGG bottles were allegedly BPA-free, as well as where and when he or she purchased SIGG bottles. The plaintiffs contend that they "and the Class reasonably interpreted SIGG's statements and/or omissions to mean that the bottles were BPA-free and did not leach BPA," (Second Am. Compl. ¶ 105), and that "SIGG concealed the fact that its bottles contained BPA for the purpose of inducing Plaintiffs and Class members to purchase SIGG bottles instead of other readily reusable bottles." (Second Am. Compl. ¶ 36(f)). Finally, they allege that "[t]he information about BPA in its bottles was information that a reasonable consumer would find relevant and rely upon in deciding whether to purchase a SIGG bottle." (Second Am. Compl. ¶ 109.)

Beyond the affirmative misrepresentations alleged, many of Plaintiffs' claims are further based on Defendant's concealment of the truth about their bottles' BPA contents. (Compl. ¶¶ 39 & 40.) They allege that "[h]ad SIGG disclosed the truth about its bottles, Plaintiffs (and

4

reasonable consumers) would not have bought the bottles." (Compl. ¶ 36(f).)

The complaint does not allege and Plaintiffs disavow any intent to prove that Defendant's aluminum water bottles present a health risk in any way or that BPA is harmful in any way as used here.

## II.

Defendant argues that the Court must determine the proper choice of law at this juncture to determine if Plaintiffs have sufficiently pled their claims under the applicable law. Plaintiffs object to such an early determination of choice of law because it is a fact-based decision and the facts have yet to be discovered. However, they do argue that the law of Connecticut should apply to all issues.

Certainly, choice of law decisions are generally based on the facts of a particular claim. The Court frequently must consider the location of the injury, the location of the allegedly unlawful actions, and other important factors. Where those are disputed, it may be appropriate to delay a decision on choice of law until the factual record is resolved. *See, e.g., Harper v. LG Electronics USA, Inc.*, 595 F. Supp. 22d 486, 490-91 (D.N.J. 2009). Of course, to properly resolve a motion to dismiss, the Court must consider the controlling law.

As the following analysis suggests, the Court will consider Defendant's arguments for dismissal under the laws of the individual Plaintiffs' state of residence.[1]

## A.

Before conducting the actual choice of law analysis, the Court must determine what

---

[1] If there are no significant differences in the states' laws on a particular issue, the Court will consider the issue generically and permit either party to file a supplemental motion if a particular, applicable state's law would result in a different outcome.

5

state's choice of law principles apply.  Under the majority position, when a case involving application of state law has been consolidated under 28 U.S.C. § 1407, the transferee court applies the choice of law rules of the transferor court.  *See, e.g., In re Rezulin Products Liability Litigation*, 210 F.R.D. 61, 69 (S.D.N.Y. 2002) ("In determining what substantive law applies, federal courts apply the choice of law rules of the forum state or, where the action has been transferred pursuant to Section 1404(a) or 1407 of the Judicial Code, the choice of law rules applicable in the transferor court."); *Byers v. Lincoln Elec. Co.*, 607 F. Supp. 2d 840, 853 n.49 (N.D. Ohio 2009).  At least one MDL transferor court, without significantly considering the issue, has applied its forum's choice of law provisions.  *See In re Baycol Products Litigation*, 218 F.R.D. 197, 207 (D. Minn. 2003).  The Court agrees with the majority approach.

In *Van Dusen v. Barrack*, 376 U.S. 612 (1964), the Supreme Court considered which state's choice of law rules should apply when a case is transferred to a new venue under 28 U.S.C. § 1404.  The Court held that "in cases such as the present, where the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." *Id.* at 639.  In reaching this decision, the Supreme Court found that a change of venue should not affect the advantages afforded to a plaintiff based on her selection of a proper forum.  *Id.* at 633-34.  That logic applies equally where a case is transferred pursuant to Section 1407.

This Court also concludes that the filing of the consolidated complaint did not waive any advantages that Plaintiffs retained based on their original forum selections.  The consolidated complaint was largely filed for the organizational benefit of the Court and the parties.  It did not seek to change any of the substantive claims of the parties or the applicable law, as evidenced by

6

the consolidated complaint's retention of numerous state law claims based on different states' laws.

These actions were originally filed in Kentucky, Minnesota and California. Given the above analysis, each of those states' choice-of-law provisions will apply to the claims filed in those states. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).

**B.**

Plaintiffs argue that the law of Connecticut, Sigg's principle place of business, should apply to all their claims. The Court respectfully disagrees and will apply the law of the place of residence. Only two named plaintiffs bought SIGG bottles in a state where he or she does not reside. While Plaintiffs are claiming economic injury which occurred at the time of purchase, numerous other factors and circumstances played into the injury, which likely occurred in the state of residence. For this reason, the Court will apply the law of the place of residence rather than the place of purchase.

Some of Plaintiffs' claims are clearly tort claims; others, such as unjust enrichment and warranty claims, have been characterized as contract claims. *Barton Brands, Ltd. v. O'Brien & Gere, Inc. of N. Am.,* No. 3:07-CV-78-H, 2009 WL 1767386, at *7 (W.D.Ky. June 22, 2009) (unpublished opinion) (finding that remaining claims, including an implied warranty claim, "lie essentially in contract.") and *Jim Huff Realty, Inc. v. Tomlin Properties, Ltd.,* Nos. 2005-CA-002245-MR, 2005-CA-002379-MR, 2007 WL 1452596, at *3 (Ky.App. May 18, 2007) (unpublished opinion) (describing unjust enrichment as a "quasi-contract claim"). Since the choice of law analysis may be different for contract and tort claims, the Court considered the case to contain both types of claims. While a choice of law analysis requires that a court first

7

determine whether the various laws actually conflict,[2] the Court will assume that the law of Connecticut differs from the law of Plaintiffs' home state for each claim.

1.

In Minnesota, the choice of law analysis for contracts and torts is the same. *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 454 (Minn. Ct. App. 2001) (applying a five factor balancing test in a dispute over a noncompete agreement) and *Fleeger v, Wyeth*, 771 N.W.2d 524, 526-27 (Minn. 2009) (discussing adoption of five factor test for choice of law analysis of tort claims). Minnesota courts look to a five factor test. *Medtronic,* 630 N.W.2d at 454. The five factors are: predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interest, and application of the better rule of law. *Id.*

The first and third factors are not given much weight in tort actions. *Burks v. Abbott Lab.*, 639 F.Supp.2d 1006, 1013 (D. Minn. 2009). However, SIGG could predict it would be held to the laws of the states in which it does business. While it would be simpler to apply Connecticut law to all claims and plaintiffs, this factor is not very influential, especially given that the other factors point towards the law of the state of Plaintiff's residence. Under the second factor, maintenance of interstate and international order, courts should consider if application of one state's law would disrespect another's sovereignty, negatively affect the movement of

---

[2] *See Ferris, Baker Watts, Inc. v. Deutsche Bank Sec. LTD*, No. 02-3682, 02-4845, 2004 WL 2501563, at *3 (D. Minn. Nov. 5, 2004) (unpublished opinion) (stating that a court should first determine if the laws conflict before proceeding to the five point choice of law analysis) and *Kearney v. Salomon Smith Barney, Inc.*, No. S124739, 137 P.3d 914, 922 (Cal. July 15, 2006) (unpublished opinion) (stating that courts should first determine if the laws are different and conflict before performing a governmental interests analysis). A court may also need to determine if the laws are procedural or substantive. *Ferris, Baker Watts, Inc.*, 2004 WL 2501563 at *3 (stating that a court should determine if the law is procedural or substantive before proceeding to the five point choice of law analysis). There is no indication that any of the laws at issue are procedural.

people or goods, or encourage forum shopping. *Ferris, Baker Watts, Inc. v. Deutsche Bank Sec. LTD*, No. 02-3682, 02-4845, 2004 WL 2501563, at *6 (D. Minn. Nov. 5, 2004) (unpublished opinion). The claims at issue in this case, both common law and statutory, are based on laws meant to protect the consumer. For instance, the implied warranty claim is meant to protect the expectations of the consumer, the concealment/non-disclosure claim ensures a consumer has all relevant information in making purchase decisions, the unjust enrichment claim compensates the plaintiff for time, money or services, and the consumer protections claims speak for themselves. Application of a state's law where the purchase was not made or the product was not used, would impede a state's ability to protect its own citizens as consumers. There is no reason to believe this conclusion would encourage forum shopping any more than the decision to apply Connecticut law.

For similar reasons, this Court also finds that the advancement of the forum's governmental interest factor points towards application of the law of Plaintiff's residence. A government has an interest in protecting its citizens from injury and in ensuring that injured citizens are compensated. Since most Plaintiffs brought their claim in their state of residence, bought their SIGG bottles in their resident state, likely used their SIGG bottles in their resident state, and probably acquired the knowledge that led to the purchase in their home state, this factor suggests that the law of the state of Plaintiffs' residence should apply. The last factor, application of the better rule of law, is only considered if the other factors do not provide clear guidance on choice of law. *Medtronic,* 630 N.W.2d at 455 (Minn. App. 2001). This Court finds that the other factors are clear. Minnesota's choice of law analysis points to application of the law of the state of Plaintiff's residence.

9

2.

The Kentucky choice of law analysis applies to the Kentucky, Illinois and Texas plaintiffs, since they all brought their action originally in Kentucky. For contract claims, Kentucky utilizes Section 188 of the Restatement (Second) of Conflict of Laws and applies the law of the state with "the most significant relationship to the transaction and parties" as defined by the principles of Section 6 of the Restatement. Restatement (Second) of Conflict of Laws § 188); *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). In the present case, there was no actual contract between plaintiffs and defendants, so many of the considerations listed in Section 188 of the Restatement (Second), such as place of contracting, negotiation or performance, are not applicable. However, the choice of law principles in Section 6 are informative and include:

> "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c)the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

Restatement (Second) of Conflict of Laws §6. In the present case, the Kentucky plaintiff bought at least some of the SIGG bottles in Kentucky, has a claim under the Kentucky Consumer Protection Act, and Kentucky has a significant interest in the protection of its residents as consumers and purchasers. Likewise, Illinois and Texas have an interest in protecting their citizens in commercial transactions, there are claims under the Consumer Protection Acts of these states, SIGG could reasonably expect to be held to the standards of the states in which they

sell their bottles, and Connecticut's interest in regulating its corporate residents does not override a state's interest in protecting its citizens. Once again, the law of the state of Plaintiff's residence would apply.

For tort claims, Kentucky courts apply Kentucky law if there are "any significant contacts" with Kentucky. *Saleba*, 300 S.W.3d at 181. The Kentucky plaintiff, Allison Johnson, bought at least some of her Sigg bottles in Kentucky; in other words, the site of the injury was Kentucky, a fact surely sufficient to find "any significant contacts." The Texas plaintiff bought her Sigg bottles on-line while the Illinois plaintiff bought his Sigg bottles at a store in Illinois. Given that these plaintiffs have no contacts with Kentucky, Kentucky law would not apply. Moreover, in cases using a Kentucky choice of law analysis where none of the parties were Kentucky residents at the time of the accident and the injury did not occur in Kentucky, the court looked, in part, to the place of injury in deciding which law to apply. *McGinnis v. Taitano,* 3 F.Supp.2d 767 (W.D.Ky. 1998) and *Rutherford v. Goodyear Tire and Rubber Co.,* 943 F.Supp. 789 (W.D.Ky. 1996). Therefore, the plaintiff's resident state provides the law.

**3.**

California courts do a governmental interest analysis for both tort and contract claims. *Kearney v. Salomon Smith Barney, Inc.,* 137 P.3d 914, 922 (Cal. 2006) (stating, "California has applied the so-called governmental interest analysis in resolving choice-of-law issues."). First, California courts determine if the possibly applicable laws are different, then consider if the different governments have conflicting interests in applying their laws to the situation; finally, if both previous questions suggest a true conflict of laws, California courts will apply the law of the state whose interests would be most impaired if its laws were not applied. *Id.* In other

words, a court should not look to which is the better policy, but rather "accommodat[e] [ ] conflicting state policies [or] allocat[e] domains of law-making power in multi-state contexts." *Id.* at 925. When dealing with contract claims within a "governmental interest approach, 'relevant contacts' stressed by the Restatement Second of Conflict of Laws are not disregarded, but are examined in connection with the analysis of the interest of the involved state in the issues, the character of the contract and the relevant purposes of the contract law under consideration." *Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.,* 14 Cal.App.4th 637, 645 (Cal. Ct. App. 1993) (citing *Kasel v. Remington Arms Co.,* 24 (Cal. App.3d 711, 731)). The factors listed in the Restatement are "(a) the place of contracting, (b) the place of negotiation of the contract, (c)the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws §188. The party advocating for application of foreign law must show that foreign law will further the interest of the foreign state. *Tucci v. Club Mediterranee,* 107 Cal.Rptr.2d 401, 407 (Cal. Ct. App. 2001).

Assuming that the laws are different, the Court must consider whether the governmental interests in applying their own laws actually conflict. As previously discussed, all of Plaintiffs' claims are based on law meant to protect the consumer. Therefore, the state where the consumer resides, and therefore likely purchased and consumed or used the product, has in interest in applying its consumer protection statutory and common law to any defendant doing business in the state. The state where the defendant has its principal place of business, in this case Connecticut, has an interest in protecting its own residents in business transactions and an interest in regulating those doing business in Connecticut; such interests can both be served by

application of Connecticut's consumer protection laws to claims by its residents. However, Connecticut cannot be said to have a strong or conflicting interest in protecting consumers who are residents of other states. This Court finds that, under a California conflict of law analysis, there is no conflict of law, and the law of the state of residence of the purchaser or consumer applies.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that the Court will apply the law as set forth herein, which is generally the law of Plaintiffs' state of residence. After future rulings, a party may alert the Court of its belief that a different law should apply.

cc: Counsel of Record